UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CHARLES ALVIS JENNINGS,                  )
                                         )
                    Petitioner,          )        Case No. 1:03-cv-611
                                         )
v.                                       )        Honorable Robert Holmes Bell
                                         )
PAUL RENICO,                             )
                                         )        **REPORT AND RECOMMENDATION**
                    Respondent.          )
_____)

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a term of life imprisonment and a consecutive term of two years, imposed by the Berrien County Circuit Court on November 11, 1999, after a jury convicted Petitioner of first-degree murder, MICH. COMP. LAWS § 750.316, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

I.      THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE VERDICT OF MURDER IN THE FIRST DEGREE AND PETITIONER HAS BEEN DENIED DUE PROCESS OF LAW U.S. CONST. AMEND. IV.

II.     WHETHER PETITIONER WAS DENIED HIS U.S. CONSTITUTION VI. AMEND. TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL'S CUMULATIVE ERRORS WERE SERIOUS MISTAKE, EPITOMIZING INCOMPETENCE THAT WAS PREJUDICIAL TO PETITIONER WHERE TRIAL COUNSEL MADE SUBSTANTIAL COMMISSION OMISSION OF ERROR AND FAILED TO PERFORM ESSENTIAL DUTIES.

III.    WHETHER PETITIONER WAS DEPRIVE A FAIR TRIAL DUE TO CUMULATIVE PROSECUTORIAL MISCONDUCT PERVADING THE

ENTIRE TRIAL PROCEEDINGS IN VIOLATION OF THE U.S. CONST. V. VI. XIV. AMENDMENT RIGHTS.

IV.     WHETHER THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT PRECLUDED COUNSEL FROM EXAMINING PETITIONER IN OPEN COURT IN ORDER TO ESTABLISH HIS DEFENSE AND COGNATE LESSER INCLUDED OFFENSE, IN VIOLATION OF THE UNITED STATES CONSTITUTION VI, XIV. AMENDMENTS.

Respondent has filed an answer to the petition (docket #13) stating that the grounds should be denied because they are either procedurally defaulted or without merit. Upon review and applying the AEDPA standards, I find that Petitioner's grounds for relief lack merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the shooting death of 16-year-old Wesley Smith in Benton Harbor, Michigan, on April 3, 1999. Petitioner was charged with one count of open murder and one count of possession of a firearm during the commission of a felony. Following a preliminary examination on April 15, 1999, he was bound over on both charges. Petitioner was tried before a jury beginning September 8, 1999, and concluding on September 9, 1999.

Joshawn Wilson testified that on the night of Friday, April 2, 1999, he was with his long-time friends, Wesley Smith, Glen Reed and Eric Gather. Wilson denied that they were gang members, but he testified that they socialized with the Insane Vice Lords gang. (Tr. I, 78.) The four went to Meg's Hall, a club where people gathered to dance and socialize. (Tr. I, 76-78.) They left the building and sat on the blue Corsica that Gather was driving. (Tr. I, 80, 84.) Petitioner, also known as "Chain," drove up behind their car. He was accompanied by Tim Mason and Corey

Wright. (Tr. I, 83, 84.) The three were affiliated with the Gangster Disciples gang. (Tr. I, 83-84.) Petitioner confronted Wesley Smith, asking if he had said something derogatory to Petitioner. The two exchanged a few words, but no threats or fight followed. (Tr. II, 86-87, 106.) After a few more questions, Petitioner got back in the car and drove away. Wilson, Smith, Reed and Gather subsequently got into their vehicle and headed toward home, with Gather driving. (Tr. I, 88-89.) As they proceeded west on Weld Street, they saw the headlights of two vehicles pulled together. (Tr. I, 91.) After they approached, one vehicle, a red Grand Am, turned in front of them. (Tr. I, 92.) Gather turned after the first vehicle and the second vehicle followed him. (Tr. I, 92.) The lead vehicle began to slow and the following car pulled close behind, forcing Gather to begin to pull over. (Tr. I, 94.) The following car pulled along the right side of Gather's car. Wilson looked over and saw Petitioner, who pointed his gun out the window and began to fire at Gather's car. (Tr. I, 96-97.) The red car sped up and Gather began to pull away. Wilson was not aware that anyone was hit until the shooting stopped. He then heard Smith gasping for air and saying that he had been shot. (Tr. II, 98-99.) Wilson saw no one else firing shots in either Gather's car or Petitioner's car. (Tr. I, 100.) He testified, however, that he saw another gun being fired from the red car, after Petitioner had fired the first three shots. (Tr. I, 109-10.) The red car was always in front of Gather's vehicle while shots were being fired. (Tr. I, 110.) On cross-examination, Wilson admitted that he and Gather had been drinking gin. Wilson denied that either he or any of the others in the car possessed a gun or fired any shots. (Tr. I, 102-03, 105.)

Glen Reed was called as the next witness for the prosecution. Reed testified that he was friends with Gather and Wilson, whom he had known for about six years. (Tr. I, 113.) In the early morning of April 3, 1999, he went to Meg's Hall with Gather, Wilson and Smith. Gather and

Wilson went into the hall and Reed and Smith drove around for a few minutes. (Tr. I, 115-16.) They returned and Smith went into the hall.  Reed then drove away for 30 or 40 minutes.  When he returned, Gather, Wilson and Smith were standing outside.  Reed and Gather began arguing because Reed had taken the car. (Tr. I, 117.)  While they were arguing, Petitioner drove up in a greenish blue Taurus, in which three other people rode. (Tr. I, 117-18.)  Petitioner challenged Smith about whether he had said something disrespectful.  Petitioner then got out of the vehicle and began arguing with Smith.  Petitioner cursed at Smith and Smith made a vague challenge to Petitioner to fight, suggesting that both were parts of groups of four. (Tr. I, 120-21.)  Petitioner got back in the car and drove off. (Tr. I, 121.)  Reed saw no weapons and no physical fight ensued.

Gather, Reed, Wilson and Smith drove off and went to the store to buy some gin. They then rode around for awhile.  Reed told Gather to drop him off at his house.  As they were going there, they came upon two cars sitting on the corner of Jennings and East May Streets. (Tr. I, 123-24.)  They backed up, fearing that the occupants included Petitioner and his friends and that they had obtained guns. (Tr. I, 125.)  They drove a few blocks evading the two cars, but saw them again as they went down Weld Street.  According to Reed, the blue car turned first, and Gather turned behind it, followed immediately by the red car. (Tr. I, 127.)  The blue car pulled over to the side and Gather drove past.  As Gather's car went past, Petitioner put his gun out the driver's window and began shooting. (Tr. I, 130.)  Everyone ducked, and Smith laid across Reed's lap.  After a few seconds of shooting, everyone got back up, except Smith, who was breathing oddly and said he had been shot. (Tr. I, 131.)  Reed set Smith upright and could not see a wound.  They drove to the hospital immediately, but Smith died before they arrived. (Tr. I, 131-32.)  Reed testified that

- 4 -

someone else fired a gun toward the front of Gather's vehicle, after Smith had been shot. Reed did not see who did the firing. (Tr. I, 132-33.)

Marcus Black testified that he had grown up with both the victim and Petitioner, as well as Gather, Reed, Wilson, and Tim Mason. (Tr. I, 143.) Black testified that he did not associate with Gather, Reed, Wilson or Smith because they were associated with a gang called Bishop Lord, which itself was associated with the Vice Lords. Petitioner and Tim Mason were associated with the Gangster Disciples. (Tr. I, 146.) Black considered Petitioner and Mason to be his friends. (Tr. I, 146-47.) On the evening of the shooting, Black was driving his uncle's dark burgundy Cavalier. No one else was in his car. While he was driving on Weld Street, Black saw Petitioner and Mason flash the lights of a stopped blue Contour, and he pulled over. (Tr. I, 148-49.) Mason described having just run into Gather, Wilson, Reed and Smith while they were driving across Union Street. (Tr. I, 151.) He had recognized Gather because of Gather's light skin, which was visible under the light from the street lamp at the corner. (Tr. I, 151.) Shortly thereafter, Petitioner and Mason called out, "There the niggers go." They yelled at Black to go, and he quickly turned the corner onto Union. (Tr. I, 152-53.) The Corsica and Contour both turned after him. (Tr. I, 155.) He was looking in his rearview mirror and saw Gather's Corsica pull up alongside Petitioner's car. (Tr. I, 153.) He heard shots, and he saw the light from two shots fired from the driver's side of the blue Contour toward the passenger side of the blue Corsica. (Tr. I, 154, 156-58.) According to Black, Petitioner was in the Contour's driver's seat, where the shots originated. (Tr. I, 156-58, 162-63.) He did not see any shots come from Gather's car, but he did not linger and drove away quickly. (Tr. I, 156.)

William Roseburgh testified that he had socialized with Petitioner until the night before Smith was shot.  Smith was a cousin of Roseburgh's cousin.  (Tr. I, 164-65.)  Late on the night of April 2, 1999, Petitioner drove to Roseburgh's house, accompanied by Tim Mason and Tommy Lewis.  (Tr. I, 168.)  Roseburgh was aware that Petitioner, Mason and Lewis had gotten into an argument with Wilson and "Winky."[1]  Petitioner said he was going to go back to Meg's Hall and look for them.  (Tr. I, 168.)  Roseburgh gave a .32 caliber revolver to Petitioner to give to Lewis.  Roseburgh knew that both Petitioner and Mason carried .357 handguns.  (Tr. I, 169.)  Petitioner and Lewis drove back to Meg's Hall, and Roseburgh and Mason drove there separately.  Roseburgh testified that he waited at Meg's Hall for about ten minutes before he returned home.  (Tr. I, 170-71.)  He did not see Petitioner or the others again that evening. (Tr. I, 171.)

Michigan State Police Detective Trooper Anthony Turner testified that he is assigned to the Violent Crimes Task Force in Benton Harbor.  (Tr. I, 175.)  He was contacted about the murder of Wesley Smith at approximately 3:00 a.m. on April 3, 1999.  He interviewed several witnesses before Petitioner was brought in sometime between 5:00 and 6:00 a.m.  Petitioner was a suspect and was given his Miranda rights.  Petitioner waived his rights and agreed to answer questions.  Petitioner admitted knowing that Smith had been killed, but he denied knowing anything about the murder.  He did, however, mention that he was riding with Tim Mason earlier in the evening when he engaged in a verbal confrontation with Smith at Meg's Hall.  (Tr. I, 178.)  Petitioner told Detective Trooper Turner that he had tried to calm Smith down and had told him he didn't want a problem.  (Tr. I, 179.)  According to Turner, Petitioner stated he left the area and went home.  (Tr. I, 179.)

---

[1]Other trial testimony indicated that Eric Gather was known as "Wink" or "Winky."

Michigan State Police Detective Sergeant Willie Mays testified next for the prosecution.  Mays and Detective Sergeant Gary Shaffer interviewed Petitioner at approximately 10:00 p.m. on April 3, 1999, while he was lodged at the Berrien County Jail on the charges involved in the instant case.  After being read his Miranda rights, Petitioner agreed to speak with Mays.  (Tr. I, 184-85.)  Petitioner told Mays that, on the night of the shooting, he and some friends had met at a party store.  He had given a female acquaintance five dollars to borrow her car.  (Tr. I, 185.)  The woman did not want Petitioner driving the car because he did not have a license, so Petitioner had Tim Mason drive.  (Tr. I, 187.)  Petitioner, Mason, and Tommy Lewis  went in one vehicle, while DeMarcus Black followed in another.  They went to Meg's Hall, where Petitioner had an argument with Wesley Smith.  (Tr. I, 187-88.)  Petitioner told Mays that he did not understand why Smith was so upset because they were not having particular problems.  (Tr. I, 188-89.)  Petitioner and Lewis got back in the car.  Tim Mason was sleeping in the car.  They left the area, followed by DeMarcus Black.

Petitioner and the others went to two houses to get guns.  The first was on Lake Street.  The second was Roseburgh's house. (Tr. I, 189-90.)  They picked up guns at both addresses.  As they drove, Black pulled alongside Petitioner's car and they spoke.  Petitioner stated that he became aware that a third vehicle was behind them when he looked in the mirror.   (Tr. I, 189, 191.)  He recognized Eric Gather, or "Wink," as he knew him.  (Tr. I, 192.)  Black pulled off and Gather pulled away, with Petitioner behind him.  Petitioner slammed on his brakes, intentionally provoking Gather's vehicle to stop next to him.  Petitioner reported that three or four shots were fired from Gather's car at his, while Gather's car was still behind.  Petitioner ducked down and fired two shots in return after the Gather's car came abreast of Petitioner's.  (Tr. I, 192, 206.)  Petitioner told Mays

that Tim Mason, who was in the front passenger seat, also had fired shots.  (Tr. I, 193.)  Petitioner and the others then drove back to Petitioner's girlfriend's house, where they hid the guns.  (Tr. I, 193.)  Tim Mason then took the car and parked it on Columbus Street.  (Tr. I, 194.)

Mays testified that he examined the two cars.  The car Gather was driving had a hole in the right-side trunk area that appeared to be caused by a large caliber bullet.  (Tr. I, 194-95, 196.)  Mays reported that no bullet holes were found in the Contour driven by Petitioner.  (Tr. I, 196-97.)  According to Mays, when the police conducted a search of Jennings's girlfriend's house, they found two .357 casings on the ground just behind the house.  (Tr. I, 197-98.)

Dr. Paul Tam testified as an expert in pathology.  (Tr. I, 217.)  On April 4, 1999, he conducted an autopsy on Wesley Smith.  He found an entrance wound in Smith's back, just under the shoulder blade.  The bullet traveled upward through Smith's lung and the base of the neck, severing one of the large arteries.  It lodged in the left side of the upper neck.  Smith bled to death from the torn artery.  (Tr. II, 218-19.)  Because of the upward trajectory of the bullet, Tam concluded that Smith was leaning forward when he was shot.  (Tr. II, 220.)

Michigan State Police Sergeant Gregory Stormzand testified that he served as a crime scene technician at the time of the shooting.  He examined the two vehicles involved in the incident, the 1995 dark blue Ford Contour and the 1990 light blue Chevrolet Corsica.  (Tr. II, 223-24.)  He dusted for fingerprints and searched for guns, casings and bullet holes.  He found Petitioner's left palm print on the Contour, but he found no casings or guns.  (Tr. II, 225.)  With regard to the Corsica, Stormzand found a bullet hole in the right rear quarter panel, just above the right taillight.  (Tr. II, 227.)  In the interior of the car, he saw two holes in the padding on the back of the right side of the seat.  (Tr. II, 229.)  On the front side of the back seat, however, only one bullet hole appeared.

- 8 -

(Tr. II, 230.)  When Stormzand opened up the back seat, he found a small circular piece of metal laying near the middle of the back seat, which he concluded was sheet metal from the rear quarter panel that was pushed through by the bullet.  (Tr. II, 231-33.)  He recovered the copper jacket of a bullet within the rear seat foam padding.  (Tr. II, 237.)

The report of the State Police Crime Lab was admitted by stipulation.  The report showed that the lead metal recovered from the victim, the jacket recovered from the car seat, and the rifling marks on the bullet all were characteristic of a .357 caliber or a .38 special caliber bullet.  (Tr. II, 248.)  The cartridge cases recovered from Petitioner's girlfriend's yard were classified as .357 magnum caliber casings, and both were fired from the same firearm.  (Tr. II, 249.)  The prosecution rested.  (Tr. II, 249.)

The first witness for the defense was Timothy Mason.  Mason testified that he had grown up with Petitioner.  (Tr. II, 251.)  During the entire day on April 2 and the early morning on April 3, 1999, Mason was with Petitioner.  By the time they went to Meg's Hall that evening, Mason was intoxicated, and he slept reclined in the front passenger seat while Petitioner and Lewis went into the hall.  (Tr. II, 252-53.)  He continued to sleep after the others returned to the car and drove off, with Petitioner at the wheel.  (Tr. II, 253.)  At some point they pulled alongside Black's vehicle and they discussed going home.  (Tr. II, 254.)  While they were pulled over, he heard some shots fired from behind.  He looked toward the driver's side and saw Black's car shoot past.  (Tr. II, 255.)  Petitioner told the others to get down, and Mason curled up in the seat.  (Tr. II, 256.)  Mason was not sure whether Petitioner had a gun, but he heard shots.  (Tr. II, 256.)  After the all the shots were fired, Petitioner drove the car to his house.  (Tr. II, 257.)  Mason denied that either he, Petitioner or Lewis were members of the Gangster Disciples.  (Tr. II, 258.)  Mason acknowledged that he had a

.357 revolver someplace in the car, but he testified that he did not have it in his hands.  (Tr. II, 270.)
He did not know what happened to the gun that night, but he did not take it with him when he drove
home.  (Tr. II, 271, 273.)

Petitioner took the stand in his own defense.  He testified that in the late evening of
April 2 or early morning of April 3, he drove to Meg's Hall, accompanied by Timothy Mason,
Tommy Lewis and Cory Wright.  (Tr. II, 282.)  When he got out of the car, he saw Wesley Smith.
He said, "What up, little bad nigger," grabbing him in a head lock.  Smith told him, "Let me go,
bitch."  Petitioner said, "All right" and let him go.  (Tr. II, 283.)  Petitioner began to talk to "Frog,"
who told Petitioner he was going to "slam" him.  Petitioner told Frog that he could not even slam
Little Wesley (Smith).  Frog got mad and drove away.  (Tr. II, 284.)  Cory Wright then told Petitioner
that Smith was talking about assassinating them.  (Tr. II, 286.)  Petitioner testified that a number of
the individuals in Smith's group were in disputes with those in Petitioner's group.  (Tr. II, 287-88.)
They drove from Meg's Hall to Roseburgh's house.  They were playing a game Gregory Traylor,
Marcus Black and Damarion Carter came over and talked.  The entire group then left Roseburgh's
house: Petitioner, Wright, and Lewis in one car; Roseburgh and Lewis in another car; and Gregory
Traylor, Marcus Black and Damarion Carter in a third car.  (Tr. II, 289-90, 305.)  They went back
to Meg's Hall for a short while and then returned to Roseburgh's house.  Roseburgh decided to
leave, so the others also left.  Petitioner drove away and Black followed.  After some time, Black
flashed his lights at Petitioner and Petitioner pulled over.  Black asked where he was going and
Petitioner told him to follow.  Suddenly, shots rang out behind them.  (Tr. II, 290.)  Petitioner ducked
and then looked up as Black drove past him.  Petitioner almost ran into him and had to stop.  When
he looked in the rearview mirror, he saw the lights from Gather's car coming up on him.  He ducked

- 10 -

down and put his arm out the window and fired.  (Tr. II, 291.)  He fired two shots.  (Tr. II, 293.)
According to Petitioner, Tim Mason put his gun out of the passenger window and fired three or four
shots.  (Tr. II, 293.)

Petitioner testified that he picked up the gun on Lake Street after he left Meg's Hall
for the first time.  (Tr. II, 292.)  He testified that he got the gun because he was afraid that a number
of the people he was with, some of whom had guns, were in disputes with the group including Smith,
Gather, Wilson and Reed.  (Tr. II, 308-09.)  Petitioner denied having engaged in a verbal argument
with Smith.  (Tr. II, 313.)  Instead, he claimed, he told Smith that "whatever you got against them
don't put me in it. . . [b]ecause I ain't got nothing to do with it."  (Tr. II, 304, 311-12, 313.)

Petitioner testified that when he got back to his girlfriend's house, he told the others
to collect the empty cartridges out of their guns and throw the casings down the street.  He threw his
casings in the yard and put the guns under the mattress.  (Tr. II, 328.)  The defense rested.  (Tr. II,
336.)

At the conclusion of trial, on September 9, 1999, the jury found Petitioner guilty of
first-degree murder and possession of a firearm during the commission of a felony.  (Tr. II, 385.)
On November 1,1999, Petitioner was sentenced to serve a term of life without parole on the murder
conviction and a consecutive two-year term on the felony-firearm conviction.  (Cir. Ct. docket sheet,
docket #17.)

**B.  Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which
was filed by counsel on June 30, 2000, raised the single issue of insufficient evidence to support the
first-degree murder conviction.  (See Def.-Appellant's Br. on Appeal, docket #23.)  On January 17,

- 11 -

2001, the court of appeals permitted substitute counsel to withdraw the original brief, and, on March 16, 2001, new counsel filed a new brief addressing the same issue. (See Def-Appellant's Substitute Br. on Appeal, docket #23.) Petitioner filed a supplemental *pro per* brief on appeal on April 19, 2001, in which he raised the three additional issues. The four issues presented in the court of appeals are the same as those raised in this habeas petition. (See Def.-Appellant's Pro Per Br. on Appeal, docket #23.) Petitioner filed a motion to remand the case, which was denied by the court on August 14, 2001. (See 8/14/01 Mich. Ct. App. Ord., docket #24.) By unpublished opinion issued on February 12, 2002, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (See 2/12/02 Mich. Ct. App. Opinion ("MCOA Op."), docket #23.)

Petitioner, through counsel, filed an application for leave to appeal to the Michigan Supreme Court. Counsel again raised the single issue raised by counsel in the court of appeals, and Petitioner filed the same supplemental *pro per* brief on appeal raising the same three claims he raised to the court of appeals. (See Def.-App. Br. on Appeal and Pro Per Supp. Br. on Appeal, docket #24.) By order entered September 30, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See 9/30/02 Mich. Ord., docket #24.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has

"drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably

- 13 -

refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.  *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).  Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*.  *Onifer*, 255 F.3d at 316.  The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *Harris*, 212 F.3d at 943.  However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  In such circumstances, the court conducts *de novo* review.  *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*,

340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

<u>**Discussion**</u>

I.    <u>Sufficiency of the Evidence</u>

In his first ground for habeas relief, Petitioner contends that the prosecutor introduced insufficient evidence to support the conviction for first-degree murder. First, he asserts that the record is devoid of evidence of premeditation and deliberation. Second, he contends that, because some testimony indicated that both Black and Mason also may have had guns and fired shots, insufficient evidence supported the jury's conclusion that the bullets fired by Petitioner were responsible for Smith's death.

A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of

review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The Michigan Court of Appeals discussed Petitioner's claims at length. The court first set forth the elements of the offense of first-degree murder under Michigan law. The court then recited substantial evidence of premeditation and deliberation:

> In this case, we find that the evidence allowed a rational trier of fact to conclude beyond a reasonable doubt that defendant did premeditate and deliberate before killing Wesley Smith. First, defendant and Smith had a previous relationship, which was marked by animosity. By all accounts, defendant and Smith had a heated conversation at Meg's Hall, a banquet hall used for parties and dances in Benton Harbor. Two witnesses testified that defendant confronted Smith outside of Meg's Hall, and defendant himself even admitted that he confronted Smith after he was told that Smith was talking about "assassinating" him.

> Defendant's actions before the murder and the circumstances of the killing likewise support a finding of premeditation and deliberation. Defendant's statement to police indicated that he left Meg's Hall and set out to arm himself and his friends with guns so that he could "take care of business." In fact, defendant obtained a .357 gun from one location and obtained a second gun from another location, which he was to give to Tommy Lewis. William Roseburgh, an acquaintance of defendant, testified that defendant told him he was going back to Meg's Hall to look for Smith because they had been in an argument earlier. Defendant did indeed return to Meg's Hall and waited for Smith for approximately ten minutes. When Smith did not return, defendant drove around Benton Harbor and eventually saw the car driven by Eric Gather, in which Smith was a passenger. In his statement to police, defendant indicated that he intentionally blocked Gather's car on the street to create a confrontation. Glen Reed testified that while riding in the car driven by Gather, the cars driven by defendant and Marcus Black followed them. After the car driven by

- 16 -

Gather turned onto Union Street, it was blocked by these two cars. Joshawn Wilson, a passenger in Gather's car, testified that he observed defendant stick a gun out of the driver's window and shoot at them. Although defendant initially denied to police that he had any involvement with the shooting, he later admitted that after the shooting, he went to his girlfriend's house to hide the guns. He also testified that he emptied the shells from the gun and tossed them in a backyard.

We conclude that, after examining the evidence, a rational trier of fact could have concluded beyond a reasonable doubt that defendant did premeditate and deliberate before the shooting. We are mindful of the fact that some of the eyewitness testimony presented at trial was, at times, contradictory. However, in reviewing a sufficiency of the evidence issue, we must not interfere with the function of the jury to listen to testimony, weigh the evidence and credibility of the witnesses, and decide the questions of fact. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748, amended 441 Mich 1201; 489 NW2d 748 (1992). Ultimately, in this case, the jurors were presented with conflicting testimony and were required to determine the credibility of each witness, the weight to afford each witness' testimony, and whether to believe the testimony of a witness in whole or in part. We will not interfere with that determination.

(MCOA Op. at 2, docket #23.)

Upon review of the whole record, I am persuaded that the Michigan Court of Appeals both accurately summarized the facts of the case and correctly applied United States Supreme Court authority. As the state court noted, notwithstanding the existence of some conflicting testimony, the evidence, taken in the light most favorable to the prosecution, amply supported the existence of premeditation and deliberation, as required under Michigan law. *See Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The second prong of Petitioner's claim of insufficiency is equally without merit. While some testimony indicated that others may have had guns, the metal jacket found in the seat cushion and the piece of bullet retrieved from the victim proved consistent with a .357 caliber cartridge, the type of weapon fired by Petitioner. Further, the cartridge cases recovered from Petitioner's girlfriend's yard, which Petitioner admitted disposing of, were consistent with having

been fired from a .357 caliber weapon.  Although limited evidence suggested that Mason may also have possessed a .357, the testimony regarding his firing shots was highly ambiguous.  In addition, Mason necessarily would have been firing from the passenger side of the car, across Petitioner or over the roof of the car, in order to hit the other vehicle.  A jury reasonably could have rejected the theory that Mason also may have fired the fatal shot.  Further, the testimony of the passengers in the victim's car was that only Petitioner was seen firing a gun as Gather's car was passing Petitioner's vehicle.  If believed, the positioning of the cars, the location of the passengers, and the testimony of all witnesses all reasonably supported the jury's conclusion that Petitioner was responsible for Smith's death, beyond a reasonable doubt.  As a result, the state court's determination that sufficient evidence supported the jury's finding that Petitioner fired the bullet that killed Smith rested on a reasonable determination of the facts and constituted a reasonable application of clearly established federal constitutional law.  *See* 28 U.S.C. § 2254(d).

II.     Ineffective Assistance of Trial Counsel

In his second ground for habeas relief, as in his state-court appeals, Petitioner asserts that his trial counsel was ineffective in a litany of ways: counsel failed to conduct an adequate pretrial investigation; failed to properly prepare Petitioner to testify and to otherwise confer; failed to call three res gestae witnesses; failed to seek recusal of the trial judge; failed to effectively cross-examine state witnesses; failed to object to the prosecutor's reference to Petitioner being in jail; failed to object to prosecutorial misconduct that shifted the burden of proof; failed to request an instruction on a lesser included offense; failed to object to erroneous jury instructions; and committed cumulative error.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). A reviewing court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

The Michigan Court of Appeals applied the *Strickland* standard and exhaustively addressed the specific claims of attorney error raised in the state court:

> First, defendant argues that his trial counsel failed to conduct a pretrial investigation, i.e., failed to interview witnesses, retain a ballistics expert, investigate an accident defense, move for change of venue, move to suppress his statements

made to police, and move for the trial judge to recuse herself. We find the record insufficient to review defendant's claim. There is simply no indication in the record regarding the type or extent of the investigation conducted by defendant's trial counsel. Thus, we consider defendant's claimed error waived. *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000). The record is likewise unsupportive of defendant's related argument that his trial counsel failed to adequately prepere him to testify and failed to consult with him about the defense theory of the case.

Defendant next arues that his trial counsel was ineffective in failing to call Cory Wright, Tommy Lewis, and Gregory Traylor to testify. Generally, decisions about which witnesses to call is a matter of trial strategy. [*People v.*] *Rockey*, [237 Mich App 74, 76; 601 NW2d 887 (1999)]. The failure to call a witness will not be considered ineffective unless it deprived defendant of a substantial defense. *People v Hyland*, 212 Mich App 701, 710; 538 NW2d 465 (1995), vacated in part on other grounds 453 Mich 902; 554 NW2d 899 (1996).

Here, defendant merely argues in general terms that the testimony of these witnesses would have "refuted the illicit testimony of Det[ective] Willie Mays." We conclude that the record is insufficient to conclude that defendant's trial counsel was ineffective in failing to call these witnesses. Defendant has neither adequately identified these witnesses nor detailed the substance and relevance of their expected testimony, and he has otherwise failed to articulate how these witnesses would have provided him with a substantial defense. Accordingly, defendant has not shown that a reasonabl[e] probability exists that, if counsel had called these witnesses, the outcome of the proceedings would have been different. See *People v Avant*, 235 Mich App 499, 508; 597 MW2d 864 (1999). Further, defendant has failed to refute the presumption that defendant's trial counsel elected not to call these witnesses as a matter of trial strategy. *Rockey, supra*. In sum, we cannot conclude, based on the existing record, that defendant was prejudiced. *Strickland, supra; Pickens, supra*.

Defendant also argues that his trial counsel was ineffective because he failed to move for the trial judge to recuse herself. Defendant argues this should have occurred because the trial judge was also the district court judge in these proceedings and conducted the arraignment and preliminary examination. Defendant, however, fails to cite authority for the proposition that a trial judge cannot be the district court judge who conducted the arraignment and preliminary examination. Defendant cannot merely announce his position and leave it to us to discover and rationalize the basis for his claims. *People v. Leonard*, 224 Mich App 569, 588; 569 NW2d 663 (1997).

Next, defendant argues ineffective assistance of counsel because his attorney failed to move to suppress his statement to police. Interestingly, in one portion of

- 20 -

defendant's brief, he argues that his statement should have been suppressed because it was involuntary; in another portion, defendant argues that the statement was fabricated by the police and that he did not make the statement at all. We find no evidence in the record to support defendant's claim that the police fabricated his statement. Similarly, there is not evidence on the record to support defendant's argument that his statement was involuntary. See, generally, *People v. Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988). Defendant spoke with police at 10:00 p.m. or 11:00 p.m. Admittedly, this interview occurred while defendant was in jail for the instant offense. However, the interview occurred after defendant requested that the police speak with him, and the totality of the circumstances surrounding the making of the statement indicate that it was freely and voluntarily made. Thus, defendant's argument fails.

Defendant further argues that his trial counsel was ineffective because he failed to appropriately cross-examine a witness, specifically Paul Tam, a pathologist. Defendant points out that Tam testified that the cause of Smith's death was bleeding to death. Defendant argues that this was a critical point for cross-examination because this testimony does not indicate that defendant caused Smith's death. This argument is meritless. Tam's testimony at trial indicated that he located a bullet wound on Smith's back. The bullet had entered Smith's back and traveled up into Smith's neck. Tam explained that the bullet tore a major artery and caused Smith to bleed to death, thus establishing that Smith died because of the gunshot wound. Consequently, there was no need for defendant's trial counsel to cross-examine Tam on this point and indeed, if defense counsel had done so, he may have lost credibility with the jury by arguing a point that was not disputable.

Finally, defendant asserts that his trial counsel was ineffective because he failed to object to the testimony of two police officers, Detective Sergeant Mays and Trooper Turner, which indicated that he had been in jail. In discussing this issue, defendant appears to frame the issue as one of impeachment under MRE 609. Defendant, however, fails to recognize that MRE 609 pertains to impeachment by evidence of the *conviction* of a crime. In this case, the testimony of Trooper Turner and Detective Sergeant Mays was devoid of any reference to defendant's convictions. Instead, the testimony of Detective Sergeant Mays only mentioned that defendant was in jail for the instant offense. We do not conclude that defendant's trial counsel was ineffective for failing to object to the reference to defendant being in jail for the instant offense. Defendant's trial counsel is not required to make futile objections. *People v Hawkins*, 245 Mich App 439, 456-457; 628 NW2d 105 (2001). Additionally, the testimony of Trooper Turner did not contain any reference to defendant being in jail. Instead, Trooper Turner simply testified that defendant was brought in at one point for questioning.

- 21 -

Having thoroughly reviewed the record, we conclude that defendant's numerous remaining allegations of ineffective assistance of counsel, including his claims that trial counsel failed to object to several instances of prosecutorial misconduct and failed to object to certain purportedly erroneous jury instructions, are unsupported by the record and without merit. Defendant has failed to overcome the strong presumption of effective assistance of counsel. *Rockey, supra.*

(2/12/2002 MCOA Op. at 4-5.)

The determinations of the Michigan Court of Appeals are patently reasonable. As the court of appeals repeatedly noted, Petitioner failed to demonstrate facts that would support most of his claims of attorney error. He does not identify how trial how any of trial counsel's alleged inadequacies of preparation prejudiced Petitioner's trial, thus failing on the second prong of the *Strickland* test. He provides nothing more than general argument that the three witnesses would have supported his case, thus failing to demonstrate how the failure to call the witnesses satisfies either prong of *Strickland*. He fails to demonstrate law supporting his assertion of entitlement to a new judge, and he fails to identify any conduct by the trial judge that would demonstrate bias. *See Chegwidden v. Kapture*, No. 03-1527, 2004 WL 551471, at *2 (6th Cir. March 18, 2004) (counsel is not required to make frivolous motions); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978).

Further, Petitioner's only basis for arguing that Dr. Tam should have been subjected to cross-examination is Petitioner's wholly unsupported conclusion that most gunshot deaths are caused by the shock of impact, not bleeding. No grounds existed for challenging Dr. Tam on cross-examination, and the state court properly noted that counsel would undermine his own credibility

by attacking Dr. Tam.  Petitioner therefore fails to overcome the presumption that counsel's performance was both adequate and a matter of strategy.  *Strickland*, 466 U.S. at 689.

Similarly, Petitioner fails to overcome the presumption that counsel was acting strategically in declining to object to the officers' brief mention that Petitioner was in jail at the time they interviewed him.  Moreover, because the jury well understood that Petitioner had been placed under arrest for the crime for which he was being tried, Petitioner cannot show prejudice.  *Id.*

As the state court indicated, Petitioner's remaining claims of attorney error are patently frivolous.  Petitioner claims that the prosecutor's introduction of evidence of gang-related activity and his argument concerning gangs constituted prosecutorial misconduct, and he asserts, trial counsel was ineffective for failing to object.  The claim, however, is wholly unsupported.  In fact, the evidence of gang activity was consistent with defense counsel's theory of the case: that the incident had occurred as the result of an exchange of gunfire between members of competing gangs. Counsel's failure to object therefore clearly was strategic.  *Id.*

Petitioner also contends that counsel erred in failing to request an instruction for the lesser included cognate offense of involuntary manslaughter.  Petitioner, however, cannot demonstrate prejudice resulting from counsel's decision.  Although instructed on the lesser included offense of second-degree murder, the jury found premeditation and convicted Petitioner of first-degree murder.  Assuming Petitioner was factually entitled to an instruction on involuntary manslaughter, because the jury rejected the more serious lesser included offense of second degree murder, Petitioner could not have been prejudiced by counsel's failure to request an instruction on involuntary manslaughter.  Petitioner's remaining claims of instructional error are equally meritless and warrant no further discussion.

In sum, the determinations by the Michigan Court of Appeals on each of Petitioner's claims of attorney error not only constituted reasonable applications of established Supreme Court precedent, 28 U.S.C. § 2254(d), but also were patently correct.   Because Petitioner cannot demonstrate that counsel erred in any respect, his claim that he was prejudiced by cumulative attorney error also is meritless.

III.    Prosecutorial Misconduct

Petitioner contends that the prosecutor engaged in misconduct on six separate occasions during trial.   The Michigan Court of Appeals discussed Petitioner's arguments at length and concluded that Petitioner had failed to demonstrate that he had been denied a fair trial.   (MCOA Op. at 5-7.)

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).   "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."   *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).   In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.   *See United States v. Young*, 470 U.S. 1, 11-12 (1985).   The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and  whether a curative instruction was given by the court.   *See*

*id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

### A.   *Res Gestae* Witnesses

As he argued in his claim of effective assistance of trial counsel, Petitioner asserts that the prosecutor engaged in misconduct by failing to produce *res gestae* witnesses Corey Wright, Tommy Lewis and Gregory Traylor.  Neither the Fifth Amendment nor the Sixth Amendment impose a duty upon the government to produce all *res gestae* witnesses.  *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 872-73 (1982) (government's deportation of illegal-immigrant witnesses does not violate a defendant's right to due process or compulsory confrontation absent a showing that the testimony of the missing witnesses would have been material and favorable to the defense); *United States v. Bryant*, 461 F.2d 912, 916 (6th Cir. 1972) (ordinarily the Sixth Amendment right to confrontation does not impose upon government the duty to call a particular witness unless government has reason to believe the testimony would exculpate the defendant); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710, at *2 (6th Cir. Aug. 24, 1988).

Michigan law formerly required a prosecutor to produce all *res gestae* witnesses at trial.  In 1986, however, MICH. COMP. LAWS 767.40a was amended to limit the prosecutor's duty to providing the defense a list of all known witnesses.  *See People v. Kevorkian*, 639 N.W.2d 291, 331 (Mich. Ct. App. 2001).  As a result, even under state law, the prosecutor had no duty to call Wright, Lewis and Traylor.  Moreover, even had state law required the prosecutor to call *res gestae* witnesses, the question would not be cognizable on habeas review.  The court may entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).

A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

### B.    Use of Race-Based Challenges on Voir Dire

Petitioner also argues that the prosecutor engaged in misconduct by striking the sole African-American juror during voir dire. The Michigan Court of Appeals expressly "decline[d] to consider this issue where 'defendant failed to raise the issue or to otherwise develop a record below that would provide us with sufficient facts to address the issue on the merits.'" (MCOA Op. at 7 (quoting *People v. Vaughn*, 504 N.W.2d 2 (Mich. Ct. App. 1993)).

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001), *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the

- 26 -

violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice or actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

Petitioner vaguely argues that counsel was ineffective in failing to challenge the racially discriminatory jury selection. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must itself be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) ; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). In his appeal to the Michigan Court of Appeals, Petitioner did not mention the

issue of ineffective assistance of counsel as the reason for his failure to object to jury selection.[2]  Not surprisingly, the Michigan Court of Appeals never addressed Petitioner's claim that counsel was ineffective for failing to object to the prosecutor's discriminatory use of peremptory challenges. Petitioner's claim, therefore, is not exhausted.  As a result, it may not serve as cause to excuse his procedural default.  *Edwards*, 529 U.S. at 453.

Even had Petitioner properly raised the ineffective assistance of counsel in the state courts, Petitioner fails to make the necessary showing to support such a claim.  *See* 28 U.S.C. § 2254(b)(2) (authorizing habeas court to deny petition on the merits notwithstanding the failure to exhaust).  Petitioner introduces absolutely no facts that would overcome the strong presumption that counsel's decision not to challenge the selection of the jury was strategic in nature.  *Strickland*, 466 U.S. at 686-88.

In *Batson v. Kentucky*, 476 U.S. 79, 96, (1986), the Supreme Court articulated a three-step analysis to be applied to an Equal Protection Clause claim that purposeful discrimination occurred in the selection of the petit jury based solely on the prosecutor's exercise of his peremptory challenges at trial.  *See United States v. Bartholomew*, 310 F.3d 912, 919 (6th Cir. 20020).  First, the Defendant must establish a prima facie case of racial discrimination.  *See United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003).  This requires an initial showing that "the defendant . . . is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."  *Batson*, 476 U.S. at 96 (citation

---

[2]In his petition for habeas relief, Petitioner does little more.  He includes a single sentence in his issue of ineffective assistance of counsel that could be construed to refer to this claim, stating that "trial counsel'[s] failure to object to the gamut of prosecutorial misconducts contained in ARGUMENT III subsections a. thur [sic] g. constituted ineffective assistance of counsel . . . ."  Even in his habeas petition, however, Petitioner does not specifically argue that defense counsel failed to object to the racially discriminatory use of peremptory challenges.

omitted).  "[T]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'"  *Id.* (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)). Ultimately, the Defendant, relying on this presumption and other facts, must "raise an inference that the prosecutor used [the practice of peremptory challenges] to exclude the veniremen from the petit jury on account of their race."  *Id.*

> Second, once the Defendant has raised the necessary inference, "the burden shifts to the state to come forward with a neutral explanation for challenging [potential] jurors."  *Id.* at 97. "The government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather it need only demonstrate that its reasons were race-neutral."  *Copeland*, 321 F.3d at 599.  More specifically, "[t]he second step of this process does not demand an explanation that is persuasive or even plausible.  'At this . . . step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

> Third, the party opposing the strike must demonstrate that the prosecutor's purported explanation is merely a pretext for racial motivation.  *See McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001) (describing *Batson* test).  Ultimately, the court must determine "whether the defendant has carried his burden of proving purposeful discrimination."  *Hernandez*, 500 U.S. at 359.  In making this determination, the Court presumes that the facially valid reasons proffered by the prosecution are true.  *Id.* at 359-60.  Racially discriminatory purpose or intent must be affirmatively shown by the opponent of the strike.  *Id.* at 360.  The ultimate burden of persuasion

always remains with the opponent of the strike.  *See United States v. McFerron*, 163 F.3d 952, 955 (6th Cir.1998).

Here, Petitioner has failed to articulate the facts of his claim.  At no point does Petitioner expressly state that the prosecutor used a peremptory challenge, rather than a challenge for cause, to exclude any minority juror.  He does not identify which juror allegedly was excused for discriminatory reasons.  He merely argues that the jury was impaneled in a racially discriminatory fashion.  As a result, Petitioner fails to make out a prima facie case to which the prosecutor would have been required to respond.  *Batson*, 476 U.S. at 96.  Further, presuming Petitioner could have established a prima facie case, Petitioner points to nothing in the record that would suggest that counsel had a substantial basis for believing that he could meet his ultimate burden of proving that racial discrimination was the reason for the prosecutor's use of any challenge.  Because the Court assumes that counsel's actions were strategic, *Strickland*, 466 U.S. at 686-88, Petitioner fails to demonstrate cause that would excuse his procedural default.  Where a petitioner fails to show cause, the Court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43.

Finally, Petitioner also has not demonstrated that manifest injustice would result from the failure to consider his claim because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent.  *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Murray*, 477 U.S. at 495).  This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *Coleman*, 244 F.3d at 540 (quoting *Schlup*, 513 U.S. at 329).  Accordingly, I conclude that Petitioner's prosecutorial misconduct claim is procedurally defaulted.

### C.       Eliciting Testimony that Petitioner Was in Jail

Petitioner next argues that, in eliciting testimony from police witnesses that Petitioner was in jail when they interviewed him, the prosecutor committed misconduct rising to the level of a constitutional deprivation.  With little discussion, the Michigan Court of Appeals concluded that the claim was meritless.

I previously determined that defense counsel's failure to object to the comments was not prejudicial and therefore would not support Petitioner's claim of ineffective assistance of counsel.  For similar reasons, the testimony, even if improper, could not be considered so prejudicial as to deny Petitioner a fair trial.  *See Darden*, 477 U.S. at 181.  Accordingly, the prosecutor's introduction of the evidence did not deny Petitioner his right to due process.  The state court determination, therefore, did not constitute an unreasonable application of established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

### D.       Constructive Amendment to Information

As his fourth example of alleged prosecutorial misconduct, Petitioner argues that the prosecutor constructively amended the information "by alluding to Petitioner being in possession of a concealed weapon or carrying a weapon without having a license to do so . . . ."  Petitioner did not raise this purported prosecutorial error in his state court appeals.  The claim therefore is not exhausted as required by 28 U.S.C. § 2254(b)(1). However, because Petitioner's claim is frivolous, the Court will deny the petition notwithstanding the lack of exhaustion.  *See* 28 U.S.C. § 2254(b)(2).

The Fifth Amendment guarantees that an accused be tried only on those offenses presented in the indictment.  *See Stirone v. United States*, 361 U.S. 212, 217-19 (1960); *see also Browning v. Foltz*, 837 F.2d 276, 280 n.5 (6th Cir. 1988) (noting that the fact that the case involved

an information rather than an indictment was constitutionally insignificant).  A defendant has a due process right to notice of the charges against him.  *See, e.g., Cole v. Arkansas*, 333 U.S. 196, 201 (1948).  "A variance occurs when 'the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'"  *United States v. Barrow*, 118 F.3d 482, 488 (6th Cir. 1997) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986)).  "A variance rises to the level of a constructive amendment to the indictment when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment."  *United States v. Rashid*, 274 F.3d 407, 413-14 (6th Cir. 2001) (quoting *Barrow*, 118 F.3d at 488).

In the instant case, Petitioner does not argue that either the presentation of the evidence or the jury instructions created a substantial likelihood that he was convicted of an offense not charged in the indictment.  Instead, Petitioner argues only that the prosecutor alluded to the fact that Petitioner's weapon, which he admittedly possessed, may have been concealed and may have been carried without a license.  Petitioner does not refer the Court to the portion of the trial transcript upon which he relies.  However, assuming Petitioner is correct that the prosecutor made allusions, such allusions would not constitute a constructive amendment to the information.  Petitioner was charged with first-degree murder and possession of a firearm during the commission of a felony. Petitioner was tried on those charges and only those charges, and the jury instructions were limited to the elements of those offenses.

With respect to the charge of possession of a firearm during the commission of a felony, the jury was instructed that, to find Petitioner guilty, it was required to find two elements beyond a reasonable doubt: (1) that Petitioner committed the crime of first-degree murder as charged; and (2) that, at the time Petitioner committed the crime, he knowingly carried or possessed a firearm. (Tr. II, 375.) To prove that Petitioner was in possession of a concealed weapon or that he was carrying a weapon without a license, the prosecutor would have been required to prove additional elements about his possession of the weapon beyond the mere fact that he possessed it. Since the jury only was asked to make findings that Petitioner possessed the firearm while committing the murder, it cannot have been influenced by any reference to other offenses requiring proof that Petitioner concealed the weapon or possessed it illegally. Accordingly, no basis exists for finding constructive amendment to the information.

### E.    Unsworn Evidence of Gang Profile

Petitioner next argues that the prosecutor improperly argued facts not in evidence and improperly introduced gang profile information into the trial. Petitioner specifically refers to five pages of the trial transcript. The first two reference (Tr. II, 318, 319) involve the prosecutor's cross-examination of Petitioner, in which the prosecutor asked Petitioner whether he heard and agreed with testimony of other witnesses. A third reference (Tr. II, 344) involves the prosecutor's comment during closing argument that Petitioner was driving in a particular gang territory, looking for trouble. The remaining two references (Tr. II, 355, 356) include portions of the closing argument of the defense, in which defense counsel points out that the prosecutor's reference to a particular area being gang territory was unsupported by the evidence.

As the Michigan Court of Appeals concluded, Petitioner's claim is frivolous.  The first two references consisted of proper cross-examination, inquiring whether Petitioner believed prior witnesses were lying about gang membership.  The third reference arguably included facts not in evidence, suggesting that the neighborhood in which Petitioner was driving at the time of the shooting was within the territory of a rival gang and that Petitioner was "asking for trouble" by driving there.  The comment, however, clearly does not rise to the level of a due process violation.  While Petitioner denied looking for Smith and the others in the Gather vehicle, the defense theory of the case was that the incident involved a gang dispute, that all parties were armed, and that Petitioner was merely defending himself after gunshots were first fired by someone else.  Indeed, the remaining two references to which Petitioner points as examples of prosecutorial misconduct are in fact portions of the closing argument of the defense, in which defense counsel used the prosecutor's earlier remark to elaborate the defense theory.  (Tr. II, 355, 356.)  In the context of these factors, he prosecutor's minor misstatement clearly did not deny Petitioner a fundamentally fair trial.  *Darden*, 477 U.S. at 181.

### IV.    Unconstitutional Limitation on Testimony of Petitioner

In his final ground for habeas relief, Petitioner contends that the trial court, in violation of Petitioner's Fifth, Sixth and Fourteenth Amendment rights, impermissibly precluded defense counsel from questioning Petitioner about certain issues related to his defense and to the cognate lesser-included offense of involuntary manslaughter.  In support of his claim, Petitioner refers the Court to an objection by the prosecutor on page 292 of the trial transcript, which was sustained by the trial court.  The only objection on page 292 of the transcript is an objection to the form of one of defense counsel's questions because it was leading.  (Tr. II, 292.)

- 34 -

In the state courts, Petitioner raised both a state-law claim that the trial court had abused its discretion and a constitutional claim.  The state court found no abuse of discretion under state law, but it did not reach the constitutional issue.  Accordingly, this Court must review the constitutional issue *de novo*.  *See McKenzie*, 326 F.3d at 727;  *Maples*, 340 F.3d at 437.

The Supreme Court has determined that a criminal defendant has the right to a "meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  The right is derived from the Sixth Amendment right to compel and confront witnesses and from the Due Process Clause of the Fourteenth Amendment.  *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process law.").

The Supreme Court, however,  repeatedly has recognized that the right to present a defense is subject to reasonable restrictions.  *See United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (the Sixth Amendment does not confer on the accused an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence"); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers*, 410 U.S. at 295; *see also Wong v. Money*, 142 F.3d 313, 325 (6th Cir. 1998).

> "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve."  Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Scheffer*, 523 U.S. at 308 (internal citations omitted).  In order for a claimed violation to rise to the level of constitutional deprivation, the evidence sought to be introduced must be deemed to have been "particularly significant" or a "fundamental element of the accused's defense."

Here the excluded testimony cannot be said to meet that standard.  Indeed, it is apparent from the record that the trial court placed no limitation on Petitioner's testimony.  Instead, the court merely upheld an objection to the form of a leading question.  The court did not bar counsel from asking the same question in a non-leading form.  The state-court action therefore did not preclude any evidence at all, much less evidence that was constitutionally "significant" or "fundamental" to the defense.  Petitioner's fourth habeas claim is entirely without merit.

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:  May 13, 2005                    /s/  Joseph G. Scoville
                                        United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).